330 F.2d 161
 64-1 USTC P 9381
 Robert Lee MERRITT and Winnie Merritt, G. Wesley Merritt and
Fannie J. Merritt, Jack D. Merritt and Willa Gray Merritt,
Virginia Bowling and Gladys Bowling, and James O. Watson,
3rd, and Lucy J. Watson, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
COMMISSIONER OF INTERNAL REVENUE, Petitioner,
v.
PARAGON JEWEL COAL COMPANY, Inc., Respondent.
 No. 9179.
 United States Court of Appeals Fourth Circuit.
 Argued Jan. 13, 1964.
Decided March 17, 1964.
 
 John Y. Merrell, Washington, D.C., for petitioners, taxpayers.
 Michael Mulroney, Atty., Dept. of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and Melva M. Graney, Attys., Dept. of Justice, on brief), for Commissioner of Internal Revenue.
 Frederick Bernays Wiener, Washington, D.C. (Leroy Katz, Bluefield, W. Va., and Carl C. Gillespie, Tazewell, Va., on brief), for respondent, Paragon.
 Before HAYNSWORTH, BRYAN and J. SPENCER BELL, Circuit Judges.
 J. SPENCER BELL, Circuit Judge:
 
 
 1
 These are consolidated appeals from the Tax Court. The issue is whether the lessee, Paragon Jewel Coal Company, Inc. (hereinafter referred to as Paragon), is entitled to the entire depletion deduction on the coal mined from its leased property or whether the several contract mine operators, petitioners in this action (hereinafter referred to as the operators), are entitled to a part of that depletion deduction based upon the amounts received by them respectively for the coal which each of them mined under agreements with Paragon. The Tax Court, which heard the cases together, decided that the lessee, Paragon, was entitled to the entire percentage depletion deduction. The operators appeal, contending that Paragon is required to share the deduction with them. The Commissioner, who took a neutral position as between the petitioners and Paragon before the Tax Court, appeals the decision in Paragon's case in order to protect his position as a stakeholder, conceding that either the operators or the lessee is entitled to the deduction, but not both.
 
 
 2
 Since the Commissioner concedes that either the operators or the lessee, Paragon, is entitled to the deduction, we find it unnecessary to go into all of the factual background, but shall confine ourselves to that part which we consider relevant to a decision of the issue between the parties. Paragon is the assignee of certain leases of coal bearing lands under which it has paid minimum royalties, tonnage royalties and land taxes. It has made substantial investments on the properties in order to prepare itself to process, ship and market the coal which was produced. Paragon's experience was as a processor and seller of coal rather than a producer; furthermore it lacked the capital to go into the producing and of the business. Rather than mine the coal itself, in entered into oral agreements with the petitioning operators and others to mine the coal by a method known as drift mining.[1] In addition to the equipment necessary for storing and processing the coal, Paragon installed a road running around the mountain close to the outcrop line of the coal over which the coal could be trucked from the mines to Paragon's tipple, where Paragon cleaned, sized and sold the coal.
 
 
 3
 Beginning with the Stilwells in 1951 (who are not petitioners here), Paragon entered into oral leases with a number of operators, all of which were similar in terms. Under the agreement an operator would be allocated a specific surface area under which it might mine. The allocation was made either by pointing it out on the ground or by showing it to him on the over-all property map. The operator agreed to mine the coal within that area and deliver it to Paragon at the operator's own expense. All expenses of opening and operating the mines were borne by the several operators. Paragon agreed to pay a fixed price at the tipple, but it was understood that the price would, and in fact it did, vary with the market. The operators were required to use and pay for the services of Paragon's engineer and to operate and maintain their mines in accordance with state and federal regulations. The contracts were silent as to who was entitled to depletion. They contained no termination date and nothing was said between the parties on this subject. The Tax Court found that:
 
 
 4
 It was anticipated by both parties that a contractor (contract mine operator) would continue mining in the location assigned to him as long as the coal could be mined and sold at a profit and as long as the contractor employed proper mining methods and produced coal meeting Paragon's specifications.
 
 
 5
 Because the contracts did not contain a specific statement that they were not terminable at the will of Paragon and because they did not contain a specific statement that the operator had a right or obligation to mine to exhaustion, the Tax Court concluded that as a matter of law the operators did not under the contracts have such rights.
 
 
 6
 We must disagree with the Tax Court's conclusions of law. Its own findings as to the intent of the parties quoted above negates its conclusions as to the legal rights of the parties under the contract. The parties contemplated that the operators would, and the evidence shows that they did, engage in large expenditures of time and money in preparing their respective sites for mining. We think the Tax Court was in error in concluding that because the oral contracts were silent on the point, the operators did not possess a non-terminable right to mine to exhaustion, especially in the face of the court's finding of an intent on the part of the parties to the contrary. It would be inequitable indeed to hold that Paragon might remain silent on this point until the operators had invested their time and money and then take the benefit of the operators' efforts at will and without cause. The burden was on Paragon to express the limitation, if any. Jack's Cookie Co. v. Brooks, 227 F.2d 935 (4 Cir. 1955), cert. denied, 351 U.S. 908, 76 S.Ct. 697, 100 L.Ed. 1443 (1956). Paragon was under obligation to mine the property. These operators were performing Paragon's obligation under its leases and this constituted ample consideration running from the operators to Paragon to make their mutual intentions with respect to the contract binding on Paragon. The fact that the contracts did not fix upon the operators an obligation to mine to exhaustion does not vitiate the binding effect of the intent of the parties to vest in the operators a right to mine to exhaustion. That the operators could cease mining would not destroy the mutuality. Phillips Petroleum Co. v. Buster, 241 F.2d 178 (10 Cir.), cert. denied,355 U.S. 816, 78 S.Ct. 18, 2 L.Ed.2d 33 (1957).
 
 
 7
 Thus we see under this interpretation of the contracts, the operators had a continuing right to produce the coal and to be paid therefore at a price which was closely related to the market price. By virtue of these contracts and their respective expenditures under them, the operators shared with Paragon an economic interest in the mineral which brings them within the rationale of Parsons v. Smith, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959); Elm Dev. Co. v. Commissioner, 315 F.2d 488 (4 Cir. 1963); and Stilwell v. United States, 250 F.2d 736 (4 Cir. 1957).[2] The Tax Court's decisions are reversed and the cases remanded for entry of an order in conformity with this opinion.
 
 
 8
 Reversed and remanded.
 
 
 
 [1]
 Drift mining is done by driving a horizontal shaft into the hillside in order to extract the coal from seams which are usually less than three feet in thickness. The process is a difficult and economically marginal operation
 
 
 [2]
 Indeed the Stilwell case arose out of the same facts, although of course the record being different, it is not res judicata