Aloyius T. and Gladys **DINGMAN,**
Plaintiffs,

v.

**UNITED STATES of America,**
Defendant.

No. 4–68–Civ. 119.

United States District Court
D. Minnesota,
Fourth Division.

June 5, 1969.

Dennis M. Mathisen, Lindquist & Vennum, Minneapolis, Minn., for plaintiffs.

Daniel J. Dinan, Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM DECISION AND ORDER FOR JUDGMENT

LARSON, District Judge.

This is a suit for the recovery of income taxes and interest in the sum of $4,332.34, paid by the taxpayers for the year 1965, plus statutory interest thereon. The case was submitted to the Court on a stipulation of facts. The issue to be resolved is whether or not payments made to the taxpayers for fill removed from their property were proceeds from the sale of a capital asset or ordinary income.

The taxpayers, Aloyius T. and Gladys Dingman (hereafter referred to as Dingman), are husband and wife. During the taxable year at issue, 1965, they filed a joint income tax return with the District Director, St. Paul, Minnesota.

During the year 1965, and for approximately twenty years prior thereto, Dingman owned and operated a riding stable known as "Dings Riding Academy." The property upon which the riding academy was located consisted of approximately 145 acres and was purchased by Dingman in 1943 for a total price of $9,000.

In 1964, the State of Minnesota condemned a five acre strip of Dingman's property for the purpose of constructing a portion of Highway 47. In 1965 the construction of Highway 47 began, and in connection therewith Barton Contracting Company (Barton), having received a contract with the State of Minnesota for constructing a portion of the highway, contacted Dingman with a view to procuring the fill necessary for raising the grade of the highway to its required level.

Dingman was willing to sell fill to Barton only to the extent that its removal would not damage the marketability of the property for use as industrial building sites. To assure himself that the property would be left in a saleable condition, Dingman agreed to sell and Barton agreed to buy 300,000 cubic yards of fill (later increased to 400,000 cubic yards) if that amount was available and could be removed without damaging the property. In order to determine the amount of fill which could be removed without damaging the property, the contract provided that Caswell Engineering Company (Caswell) would make a determination of the amount of fill availa-

ble, and supervise its removal. In addition, Barton agreed to grade the property and replace the topsoil after removal was completed.

The basic question to be considered in deciding whether a particular transaction is a sale entitling the owner to capital gains treatment is whether the taxpayer has retained an "economic interest" in the deposits removed. The term "economic interest" as used in this type of case was defined in Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956), which involved a depletion allowance on oil and gas income. The Court stated:

> "that a taxpayer is entitled to depletion where he has: (1) 'acquired, by investment, any interest in the oil in place,' and (2) secured by legal relationship 'income derived from the extraction of the oil, to which he must look for a return of his captial.' * * *"

> "These two factors, usually considered together, constitute the requirement of an 'economic interest.'" 350 U.S. at 314, 76 S.Ct. at 398.

In applying this definition to various factual situations the Courts have looked to a number of different factors in order to determine whether particular proceeds should be taxed as capital gains or ordinary income. Some Courts have considered the purpose of the contract and whether it obligated the purchaser to remove and pay for all of the material on the taxpayer's property. See, e. g., Gowans v. Commissioner of Internal Revenue, 246 F.2d 448 (9th Cir. 1957). Other Courts have considered the phraseology of the agreement and the period during which the mineral was to have been removed. See, e. g., Barker v. Commissioner of Internal Revenue, 250 F.2d 195 (2d Cir. 1958), rev'g 24 T.C. 1160; Crowell Land & Mineral Corp. v. Commissioner of Internal Revenue, 242 F.2d 864 (5th Cir. 1957), rev'g 25 T.C. 223.

In Linehan v. Commissioner of Internal Revenue, 297 F.2d 276 (1st Cir. 1961), the Court held in favor of the taxpayer and considered, as the controlling factor, the fact that the taxpayer received "fixed prices per cubic yard without reference to the prices received or the profits, if any, made by the exploiters." 297 F.2d at 279. Although this is the situation in the instant case, it does not control the disposition of the case. The Court of Appeals for the Eighth Circuit in Rabiner v. Bacon, 373 F.2d 537 (8th Cir. 1967), stated that the method of payment is not dispositive of the question of economic interest. In Rabiner the Court looked instead to whether the taxpayer's income was derived solely from the extraction and was geared to the production of the mineral. 373 F.2d at 539.

The Agreement in the instant case provided that Barton would purchase 400,000 cubic yards of fill if that amount was available. The determination of the amount of fill available was to be made by Caswell, an independent third party. The determination was made necessary by Dingman's desire to utilize the property as a building site for industrial property. By the Agreement Barton was obligated to take all the fill on Dingman's property which could be removed without lowering the value of the property as a building site, up to 400,000 cubic yards. Barton was also obligated to pay Dingman fifteen cents per cubic yard. The Agreement was, in effect, a sale of all the fill available on Dingman's property, not a lease of mining or extraction rights. Barton was obligated to pay for all the fill available on the land, even though the exact amount available would not be determined until after the contract was signed and the engineering survey made.

This is not a case, such as Rabiner, where the taxpayer's income was derived solely from the extraction of the fill. Here the extraction of the fill was incidental to the taxpayer's main purpose of developing industrial building sites. This is supported by the fact that in addition to its inability to remove fill, if its removal would devalue the property, Barton was obligated to grade the land

and replace the topsoil. This is inconsistent with the theory that the taxpayer was deriving income solely from the extraction of minerals. In addition, Dingman's income was not geared to the production of the fill, but was established once the amount of fill available was ascertained.

For the above reasons the Court finds in favor of the plaintiff taxpayers.

## ORDER FOR JUDGMENT

Judgment will be entered for plaintiffs and against defendant in the sum of Four Thousand Three Hundred Thirty-two and 34/100 ($4,332.34) Dollars, plus interest from August 28, 1967.